**YANKTON SIOUX TRIBE, and its individual members, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; Thomas E. White, Secretary of the Army; Dominic Izzo, Principal Deputy Assistant Secretary of the Army for Civil Works; Robert E. Flowers, Chief of Engineers; Curt F. Ubbelohde, Omaha District Commander and District Engineer; the United States of America; the State of South Dakota; John Cooper, Secretary of the Department of Game, Fish and Parks for the State of South Dakota; and John Does, Contractors, Defendants.**

No. CIV. 02–4126.

United States District Court,
D. South Dakota,
Southern Division.

April 18, 2003.

. Mary Turgeon Wynne, Okanogan, WA, for Plaintiffs.

Bonnie P. Ulrich, U.S. Attorney's Office, Sioux Falls, John P. Guhin, Charles D. McGuigan, Attorney General's Office, Pierre, for Defendants State of South Dakota; John Cooper.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

The State of South Dakota, John Cooper, Secretary of the Department of Game, Fish and Parks for the State of South Dakota, and John Does, contractors (collectively referred to as the "State defendants"), filed a Motion to Allow Adoption of Archeologist's Recommendations, Doc. 45. The Court previously granted a preliminary injunction in favor of the plaintiffs, the Yankton Sioux Tribe, a federally recognized Indian Tribe, and its individual members, prohibiting the State defendants from conducting any excavation, building or other construction activi-

ties at the North Point Recreation Area on certain locations marked as "A", "B" and "C" on the map attached to the preliminary injunction Order. Defendants, United States Army Corps of Engineers ("Corps"), Thomas E. White, Secretary of the Army, Dominic Izzo, Principal Deputy Assistant Secretary of the Army for Civil Works, Robert E. Flowers, Chief of Engineers, Curt F. Ubbelohde, Omaha District Commander and District Engineer and the United States of America (collectively referred to herein as the "Federal defendants") filed a response to the motion indicating they have no objection to the motion. Plaintiffs, however, object to any order that would "further disturb the human remains and artifacts unearthed by the defendants." (Tribes Response, Doc. 52.)

Following the filing of the plaintiffs' response, Doc. 52, plaintiffs filed an Affidavit of Michael S. Burney, Doc. 54, with an attached document entitled the Ihanktonwan's Sacred Place Called White Swan. Burney is an archeologist retained by the plaintiffs in this action. The State defendants then filed a Motion to Allow Filing of Supplement, Doc. 55, to respond to the late affidavit filed by plaintiffs, which the Court granted.

The Court held a hearing on the State defendants' motion on April 7, 2003. Plaintiffs appeared by their attorney Mary Wynne, the State defendants appeared by their attorney, John Guhin and the Federal defendants appeared by their attorney Bonnie Ulrich. Also participating at the hearing was defendant John Cooper, Secretary of the Department of Game, Fish & Parks for the State of South Dakota; Doug Hofer, Parks & Recreation Director; Bob Schneider, Director's Assistant for Operation of the Missouri River; Charles McGuigan, attorney with the Attorney General's office; and Jim Donohue, archeologist. These individuals answered

questions by the Court and counsel, but their answers were not given under oath.

During the April 7, 2003 hearing, the Court informed the parties that a decision would be issued during the week of April 14, 2003. Before the decision was issued, however, the Court received in chambers the Plaintiffs' Motion to Reconsider Court's Proposed Order and an Affidavit of Lawrence Kiyukan with an attached map on April 14, 2003. Upon reviewing the motion, the Court determined that an evidentiary hearing should be held to consider the State defendants' motion as well as plaintiffs' motion to reconsider. A hearing was conducted on April 14, 2003 with all parties represented by their counsel and Glenn Drapeau appearing as the Yankton Sioux Tribe's representative.

## FACTUAL BACKGROUND

In the Memorandum Opinion and Order granting the preliminary injunction, the Court stated that the preliminary injunction would remain in effect until the earlier of four events. One of those events is if the Court would alter the preliminary injunction in light of information that may be submitted by the defendants demonstrating that construction activities at location A will not further damage the area where Native American cultural items were inadvertently discovered on May 14, 2002 and thereafter and that the fill dirt from location A that was placed at locations B and C has been thoroughly examined and does not contain any Native American cultural items, as defined in 25 U.S.C. § 3001(3), (9).

In support of their motion, the State defendants submitted a document authored by James A. Donohue entitled "An Assessment of Fill Content in Area C, the North Fill Area and Area B, the South Fill Area, North Point Recreation Area, Charles Mix County, South Dakota" (hereinafter referred to as "Donohue's Report").

Donohue's Report contains observations and recommendations by Burney, the plaintiffs' archeologist, who monitored Donohue's investigations of Areas B and C. The conclusion in Donohue's Report is that there is a portion of Area C that contains human remains and funerary objects but there is "almost no chance" of remains or artifacts being located in Area B. During the April 17,2003 hearing, Donohue further explained his testing procedures and conclusions as contained in his report.

The method of investigation is thoroughly explained in Donohue's Report and Burney's observations as set forth in the report do not criticize the method of testing Areas B and C for Native American cultural items. Although Burney later criticized the method of investigation in a conclusory affidavit, he did not specify how Donohue's method was faulty or archeologically unsound. (Burney Affidavit, Doc. 54.) Burney testified at the April 17,2003 hearing that no amount of sample testing of these areas would be sufficient, according to the plaintiffs, to rule out the possibility that Native American human remains or funerary items are located in Areas B and C. Burney did not, however, explain how the testing conducted and supervised by Donohue was archeologically unsound.

Donohue identifies three options for Areas B and C: (1) leave the fill as it lays in Areas B and C; (2) remove the portion of the fill with the highest probability of containing human remains and associated artifacts and return it to the burial site, Area A; and (3) remove all fill from both Areas B and C and return it to Area A. The option recommended by Donohue is option two. It is recommended that a strip of fill 20 meters wide adjacent to the road over the entire length of Area C be returned to Area A. This recommended fill removal area is depicted on page 15 of Exhibit D admitted at the April 17 hearing. Dono-

hue stated that this option would result in the return of the known human remains and funerary objects to the place from which they were initially removed.

While Hofer estimated during the April 7 hearing that the cost to initially move the dirt from Area A to Areas B and C was between $40,000 and $80,000, during the April 17 hearing, he testified that the cost was $21,000. The fill dirt was being placed at Area C for the building of a park maintenance complex and campground registration building, which will be referred to as the "administration building," as well as a parking lot. The fill dirt was moved to Area B for the purpose of building a waste dump site for the holding tanks of recreational vehicles and a fish cleaning station as well as parking lots. If the State defendants are required to build the administration building and the sanitation stations in a different location, Hofer testified it would cost in excess of an additional $100,000.

In Burney's Recommendations in Donohue's Report, Burney states that number three is the preferred option by the plaintiffs. In his affidavit filed on March 24, 2003, however, it appears that Burney does not believe the fill dirt in Areas B and C should be removed: "[i]t is my professional opinion that continued removal of fill dirt at sites containing human remains and cultural artifacts would further damage those remains and artifacts." (Burney Affidavit, Doc. 54.) In plaintiffs' response to the motion, they indicate it is their preference that all earth removed from Area A be left at Areas B and C. This preference includes a permanent restriction on any further development of Areas B and C. Further, plaintiffs suggest that the State defendants could transfer the land to the plaintiffs to provide permanent protection to the sites.

At the April 7 hearing, plaintiffs clearly stated their position that they do not want the dirt in Areas B or C disturbed and moved back to Area A. From comments made by plaintiffs' counsel at the April 17 hearing, the Court concludes that the plaintiffs' favored position is to leave the fill dirt in Areas B and C undisturbed with no further construction, but that if construction is going to be allowed, they desire to have all the fill dirt from Areas B and C returned to Area A.

Burney informed plaintiffs that there are remains throughout Area C and possibly in Area B and that removal of the dirt will result in additional damage to those remains. There is no affirmative evidence in the record, however, to support Burney's belief that there are human remains or funerary items in Area B aside from the fact that the testing done was a sampling.

In their written motion, the State defendants asserted that it was urgent to have this motion resolved by April 1, 2003, to allow them time to let the appropriate contracts and complete the project. A serious sanitation problem will develop during the 2003 camping season, the State defendants emphasize in their written motion, because the old sanitation station has been removed from the North Point Recreation Area. During the April 7 hearing, the Court was informed that the old sanitation station was for campers to empty the holding tanks of their recreational vehicles. The "comfort stations" as the State called them, which apparently are toilets for personal use, are still present for the use of persons at the park.

During the April 7 hearing, the Court asked several questions regarding the urgency of the State defendants' motion. Hofer informed the Court that a new sanitation facility is needed for campers at North Point to empty their recreational vehicles' holding tanks prior to departure from the park. If the construction is not completed, the nearest dumping station for

North Point visitors is approximately four to six miles from North Point. There are currently approximately 100 camping spots at North Point. When Hofer testified at the April 17 hearing he stated that North Point is the fifth most-visited park in South Dakota, with approximately 231,000 visitors during 2001.

In addition to a dumping station, the proposed construction will provide a fish cleaning station. If this construction is not completed, there will be no sanitary place at North Point for campers to dump their recreational vehicles' waste holding tanks or for visitors to clean their fish, other than the primitive fish cleaning sites explained below. The short-term sanitation plan explained at the April 7 hearing is to construct a 1,000 to 2,000 gallon holding tank, which will temporarily store waste. The waste from the holding tank will then be trucked out of North Point to an appropriate sanitation facility. The State defendants furnished detailed drawings after the April 7 hearing that showed two 1,000 gallon holding tanks and a 2,000 gallon holding tank. The two sheets of drawings have been placed in the Court file as was the letter of April 7, 2003 from the State, which accompanied the drawings. (Doc. 63.) The drawings were also marked as Exhibits F and G at the April 17 hearing. The long-term plan of the State defendants is to construct a lagoon or lagoons for all sanitation needs at North Point and that is planned to be completed later this year. Any issues concerning proposed lagoons are not now before the Court.

Following the April 7 hearing, the Court understood there were no sanitary fish cleaning sites available at North Point.

On the map submitted by plaintiffs with their Motion to Reconsider and Kiyukan's Affidavit, it is indicated that there are currently three fish cleaning sites at North Point. (Doc. 65, Ex. 3.) The larger version of Exhibit 3 filed as Doc. 65, was also marked as Exhibit 7 during the April 17 hearing. Kiyukan testified during the April 17 hearing that the fish cleaning site located on the far West of the map (Exhibit 7) was a shelter, but he did not look inside the shelter to determine what physical facilities were present for fish cleaning. He further testified that the two additional fish cleaning sites identified on Exhibit 7 consisted of tables with garbage cans for disposing of fish waste. Hofer testified at the April 17 hearing that the sites identified on Exhibit 7 as fish cleaning sites are "temporary, primitive" sites and does not consider them permanent fish cleaning sites. There is no electricity, running water or septic system at any of the sites identified as fish cleaning sites on Exhibit 7. The garbage cans at those sites need to be emptied two to three times per day by park staff when the sites are used during the summer. The smell in warmer months and lack of water are both significant problems with these temporary cleaning sites.

The waste dump and fish cleaning stations with underground tanks are currently planned to be constructed in Area B. This location was chosen because of its convenience for park visitors as well as its proximity to the administration building planned for Area C. The State defendants were in the process of hauling fill dirt to Areas B and C when the inadvertent discovery prompting this lawsuit occurred in May 2002.[1]

---

**1.** The defendants argued at the April 17 hearing that at the time of the inadvertent discovery in May 2002, the contractor was hauling dirt from Area A only to Area C, not to Area B. When the hearing was conducted on the motion for preliminary injunction, the Court understood that fill dirt from Area A was placed at both Areas B and C. The Court is not convinced by the hearsay statements from "the contractor" or "the foreman" admitted

After the inadvertent discovery of human remains and the preliminary injunction was issued, the State defendants abandoned plans to build or improve 36 additional camp sites in the vicinity of Area A. With the exception of the planned construction in Areas B and C, nearly all work to complete the development of North Point has been completed. The work to be completed outside of Areas B and C consists of minor utility work and grass seeding that is planned to be completed by Memorial Day in 2003. The wooden building that will be the administration building has been pre-built and plans are to place it on a poured foundation in Area C.

## DECISION

The history of this action has been detailed in two prior opinions, dated June 28, 2002, Doc. 33, and June 14, 2002, Doc. 14. The Court entered a temporary restraining order followed by a preliminary injunction on plaintiffs' NAGPRA claims. The Court will continue to refer to the relevant specific locations at North Point as Areas "A," "B," and "C" on the map as attached to the prior Orders as well as this Order. Maps and drawings of these Areas have been produced and were introduced as Exhibits during the April 17 hearing as Exhibits F, G and 7.

Based upon the information currently available to the Court, the balancing factors explained in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc) have been reconsidered and applied by the Court: (1) the threat of irreparable harm to plaintiffs; (2) the state of the balance between this harm and the injury that granting the temporary restraining order will inflict on the defendants; (3) the probability of plaintiffs' success on the merits; and (4) the public interest.

The Court finds there is a significant threat of irreparable harm to the plaintiffs if there is further exposure of human remains or loss of remains or funerary objects from Areas A and C. Several remains have already been removed from Area A and additional remains have been observed in the immediate vicinity. There are additional human remains still embedded in the ground at Area A. Human remains and funerary objects have been located at Area C. Even though those objects have not been evenly distributed over all of the Area of C, the suggested division of only removing a portion of the fill dirt from Area A placed at Area C is cutting it too close, having relied primarily upon small test holes 25 to 30 meters apart. Given the known human remains and funerary objects in the fill dirt from Area A placed at Area C, more intensive testing than in an area with no known human remains or funerary objects would seem warranted. Given the evidence presented during the preliminary injunction hearing, there is a high probability that the human remains discovered in Area A in May and June 2002 and those discovered in Area C thereafter are the Tribes' ancestors. If construction activities resume before plaintiffs and the Corps are able to make a reasonable effort to protect the items discovered, the human remains and funerary objects, sacred objects or objects of cultural patrimony may be irreparably damaged. *See* 25 U.S.C. § 3003(d)(1), 43 C.F.R. § 10.4(c), (d)(1).

Area B, however, has been examined by the State's Archeologist, James Donohue, and he has opined that there are no human remains, funerary objects, sacred objects

at the April 17 hearing during Donohue's testimony that none of the fill dirt from Area A was placed in Area B in the Spring of 2002.

or objects of cultural patrimony in Area B. Plaintiffs contend that the testing was not sufficient, but neither Burney's Affidavit nor his testimony during the April 17 hearing specify how the testing performed by Donohue was deficient according to professional archeological standards. The Court recognizes that the nature of sample testing leaves room for error, but finds that, based upon the information currently available to the Court, the testing performed by Donohue, and observed by Burney, was sufficient under the archeological standards set forth in Donohue's Report and testified to during the April 17 hearing to identify those portions of Area B that may or do contain Native American cultural items, as defined in 25 U.S.C. § 3001(3), (9). With no human remains or funerary objects having been found in Area B, the testing or sampling conducted in Area B was adequate.

Having considered the balance of the harm between the parties the Court finds that this factor tips in favor of plaintiffs as to Areas A and C, but tips in favor of the State defendants as to Area B. The harm to plaintiffs is high given the sensitive nature of this action. Areas A and C contain additional human remains and funerary objects. Further construction in Area A at this time poses a significant risk of additional inadvertent discoveries of Native American items protected by NAGPRA. The harm to the State defendants from no further construction or excavation in Area A is not high. The harm to the State defendants from continuing to enjoin construction in Area B, however, is significant. There are 100 camping spots at North Point and there is no sanitation system at North Point to process and dispose of the visitors' human waste and other waste that accumulates in the holding tanks of their recreational vehicles. In addition, there is no sanitation system to process and dispose of the waste from fish cleaning, other than garbage cans at the

sites identified as fish cleaning sites on Exhibit 7. These sites consist of tables and garbage cans. Although it is inconvenient for park visitors, the recreational vehicles can be driven the four to six miles to empty their tanks. The sites identified as fish cleaning sites on Exhibit 7, however, are not sanitary and it is more desirable from a sanitation standpoint to have a fish cleaning station equipped with sanitary tables, fresh water, a system to grind the fish waste and a septic system to dispose of fish waste. A serious sanitation problem may well develop during the 2003 camping season at North Point if the State defendants are preventing from constructing a sanitation system. There is no affirmative evidence in the record to show that plaintiffs will suffer any harm from further construction in Area B because no Native American human remains or funerary objects have been found in Area B. As to Area C, there are human remains and funerary objects. These remains and objects are in the borrow dirt removed from Area A and placed at Area C in May 2002.

Although plaintiffs understandably do not want the borrow dirt currently located in Area C disturbed in any way, the regulations implementing NAGPRA do not permanently prohibit inadvertent discoverers from conducting construction activities in the area where Native American cultural items are inadvertently discovered. *See* 43 C.F.R. § 10.1 *et seq.* The inadvertent discovery occurred nearly one year ago in May 2002 and there has been a preliminary injunction in place since June 2002. The regulations contemplate that Native American cultural items may be excavated. *See* 43 C.F.R. § 10.3. The situation presented at Area C, however, is not explicitly discussed in the regulations. In this case, the items were inadvertently excavated from Area A and deposited in Area C. The State defendants are seeking to return the inadvertently excavated items from Area C

to Area A. This action will harm the plaintiffs in the sense that they do not want to have the human remains and funerary items disturbed or disturbed again by having those items returned to their original burial locations. To reduce the harm to plaintiffs, the State defendants will be required to give plaintiffs written notice of the commencement of removal and replacement of the borrow dirt from Area C back to Area A. In addition, plaintiffs will be allowed to perform religious ceremonies both before and after the removal and replacement of the borrow dirt from Area C back to Area A.

The Court's earlier finding remains accurate that the probability for success on the merits relating to the NAGPRA claims is modest. As with the motions for temporary restraining order and preliminary injunction, the merits of the non-NAGPRA claims will not be evaluated at this point in the proceeding because the preliminary injunction relates only to plaintiffs' NAGPRA claims. This factor weighs in favor of defendants.

■ As to the public interest factor, the Court concludes it weighs in favor of protecting the human remains and funerary objects in Areas A and C as Congress directed in NAGPRA. Given the plaintiffs' beliefs about their ancestors and how disturbance of their ancestors' remains affects plaintiffs' lives, the public interest factor weighs in favor of plaintiffs, at least to the point of protecting the status quo at Area A and returning the human remains and funerary objects in Area C to Area A before construction may resume in Area C. With respect to Area B, the public interest factor weighs in favor of the State defendants. Area B has been thoroughly examined by the State's archeologist, with the plaintiffs' archeologist observing the testing, and no human remains or funerary objects were located in Area B. It is in the public interest to have appropriate sanita-

tion systems at North Point given its close proximity to the Missouri River and the high number of visitors at North Point during the camping season. With the condition that the borrow dirt from Area C be moved back to Area A, as explained in this Order, the public interest factor weighs in favor of immediately dissolving the preliminary injunction as to Area B and dissolving the preliminary injunction as to Area C if the borrow dirt is removed from Area C and returned to Area A as explained in this Order.

■ Weighing the *Dataphase* factors, the balancing weighs in favor of plaintiffs as to Areas A and C, but weighs in favor of the State defendants as to Area B. If the State defendants choose at their expense to return the borrow dirt in Area C back to Area A, then the balancing as to Area C shifts to the State defendants' favor and they may proceed with the planned construction once the borrow dirt has been returned to Area A. The Court will continue the preliminary injunction as to Area A based upon the Court's weighing of the *Dataphase* factors explained above. The record demonstrates that human remains are embedded in the soil in Area A. Moreover, the State defendants do not seek to modify the preliminary injunction as to Area A. Thus, the Court will order that no further excavation, building or other construction activities be conducted in Area A, except as required in this Order regarding the return of borrow material from Area C. The preliminary injunction as to Area B will be immediately lifted and the State defendants may resume construction in Area B. No Native American cultural items as defined in 25 U.S.C. § 3001(3), (9), have been found in Area B and the possibility that there may be some there, despite a significant and adequate amount of testing, is not a basis for continuation of the preliminary injunction regarding Area

B. The preliminary injunction as to Area C is modified to the extent that the State defendants may resume construction in Area C if they have moved the borrow dirt from Area C back to Area A in compliance with this Order as stated below. Accordingly,

IT IS ORDERED:

1. That the State defendants' Motion to Allow Adoption of Archeologist's Recommendation, Doc. 45, is granted with respect to Area B and is granted in part as to Area C to the extent set forth in paragraphs 2, 3, 4, 5, 6 and 7 and is denied in all other respects.

2. That John Cooper, in his official capacity as the Secretary of the Department of Game, Fish and Parks for the State of South Dakota, and his officers, agents, servants, employees, attorneys, and persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise, are preliminarily enjoined from: (a) conducting any excavation, building or other construction activities at the North Point Recreation Area location marked as "A," on the map attached to this Order, except to the extent necessary to return the borrow material from Area "C" to Area A as explained in this Order; and (b) conducting any excavation, building or other construction activities at the North Point Recreation Area location marked as "C," on the map attached to this Order, except the removal of borrow dirt from Area C back to Area A.

3. That the preliminary injunction imposed in paragraph 2(b) above as to Area C will be lifted and the State defendants may resume construction in Area C if the borrow dirt in Area C is moved back to Area A in compliance with this Order, as stated in paragraphs 4, 5, 6 and 7 below.

4. That plaintiffs, including their archeologist, Michael Burney, may observe the removal and replacement of the borrow dirt from Area C back to Area A.

5. That the State defendants shall provide written notice delivered to the Chairperson or some other member of the General Council of the Yankton Sioux Tribe of the date on which the removal and replacement of the borrow dirt from Area C back to Area A will commence.

6. That the plaintiffs, after receiving the written notice specified in the preceding paragraph 5, will then have seven (7) days after receiving the written notice within which to conduct such ceremonies at Areas C and A as the Yankton Sioux Tribe believes appropriate. After such time has passed, then the State defendants may proceed with the removal and replacement of the borrow dirt from Area C back to Area A. During the initial seven (7) day period and the second seven (7) day period identified in paragraph 7 below, members of the Yankton Sioux Tribe and anyone else they invite to participate in the ceremonies shall have access at all times to Areas A and C.

7. That after all of the borrow dirt has been returned to Area A from Area C, the State defendants shall give the plaintiffs written notice of such completion, with notice to be given in the same manner as in paragraph 6 above. After such notice is given, members of the Yankton Sioux Tribe and anyone else they invite shall have seven (7) days to conduct such additional ceremonies as the

Yankton Sioux Tribe believes appropriate, this being the second seven (7) day period, before the State defendants may resume construction activities in Area C.

8. That the preliminary injunction previously entered with respect to Area B is immediately lifted and the State defendants may begin construction in Area B as identified on the attached map.

9. That the Court will not require the Yankton Sioux Tribe or its members to post security or bond under Fed. R.Civ.P. 65(c).

10. That the plaintiffs' Motion to Reconsider, Doc. 65, is granted to the extent that construction may not continue at Area C unless all of the borrow dirt is removed from Area C and returned to Area A in accordance with this Order and is denied in all other respects.